CLARKE et al. v. RICHMOND & W. P. TERMINAL RAILWAY & WARE-HOUSE CO. et al.

(Circuit Court of Appeals, Fifth Circuit. June 12, 1894.)

No. 203.

1. CORPORATIONS—STOCK CONTROLLED BY COMPETING CORPORATION—RIGHT TO VOTE.

Stock in a railroad corporation of the state of Georgia was registered in the name of a corporation of another state, and its voting power was held by another foreign corporation, neither of which was a carrier; but the voting power was controlled by a carrier corporation of another state, which was in competition with the railroad company as to interstate traffic, though not as to matters domestic to the state of Georgia. No contract affecting such stock was shown to have been made by the parties in Georgia, or with any Georgia corporation. *Held*, that the right to vote on such stock was not affected by the provision of the constitution of Georgia declaring illegal and void all contracts or agreements with corpora-tions which may lessen competition in their respective businesses, or en-courage monopoly.

2. APPEAL—DISCRETION OF COURT BELOW—COSTS.

An award of costs, within the discretion of the court below, will not be reviewed on appeal, except in case of grave and manifest abuse.

Appeal from the Circuit Court of the United States for the South-ern District of Georgia.

This was a suit by Rowena M. Clarke against the Central Railroad & Banking Company of Georgia and others, in which Francis S. Hesseltine and others intervened and became co-complainants. . The circuit court dismissed the bill. Complainants appealed.

For reports of previous decisions in the circuit court, see 50 Fed. 338; 54 Fed. 556.

A. O. Bacon, for appellants.

Henry Crawford and A. H. Joline, for appellees.

Before McCORMICK, Circuit Judge, and LOCKE and PAR-LANGE, District Judges.

McCORMICK, Circuit Judge. The Central Railroad & Banking Company of Georgia (hereinafter referred to as the Central Com-pany) is a corporation created by and existing under the laws of the state of Georgia, having its origin in an act entitled "An act to incorporate the Central Railroad and Canal Company of Georgia," approved December 20, 1833, by which, and the various acts amendatory thereof and supplemental thereto, and by reason of its consolidation with the Macon & Western Railroad Company, a corporation created by and existing under the laws of the state of Georgia, and with other corporations, it was authorized to issue, and did, prior to the 1st day of January, 1887, issue, its capital

stock, which might be and was acquired by other corporations and by individuals; the ownership of its stock carrying with it the right to the holder, of record, of each share thereof, or his appointee or proxy, to cast one vote upon such share at any meeting of the stockholders to be held for any purpose, including the election of directors of the company. The main stem of the Central Company is a railroad running from the city of Savannah, through the city of Macon, to the city of Atlanta, with a branch extending from Gordon, in Wilkinson county, to Milledgeville, and is the only railroad directly owned by the Central Company. The total issue of stock of the Central Company is 75,000 shares, each of the par value of $100, aggregating $7,500,000. Up to the 1st day of June, 1891, the Central Company, as owner, lessee, or otherwise, operated and controlled railroads having an aggregate of 2,400 miles, covering the chief commercial points in Georgia, and in several of the adjoining states. It also operated and controlled, in like manner, ocean steamship lines running regular packet ships to Boston, New York, and Philadelphia; the aggregate value of all its properties being variously stated in the oral argument of counsel at from forty to sixty millions, with its business extended in some degree, and in one way or another, to all the country east of the Mississippi river, and beyond it, in some quarters. Prior to the 1st day of July, 1887, various persons, who had acquired and owned 40,000 shares of the capital stock of the Central Company, procured to be created and organized under the laws of North Carolina the Georgia Company, to which company they transferred their 40,000 shares of Central Company stock, receiving in exchange therefor 120,000 shares of the capital stock of the Georgia Company, of the par value of $100 each, together with 4,000 of its first mortgage collateral trust bonds, each for the sum of $1,000, the payment of the principal and interest of which was secured by a mortgage or deed of trust by which the 40,000 shares of the Central Company stock were hypothecated for the benefit of the holders and owners of these bonds, in which mortgage or deed of trust it was provided that the voting power belonging to these 40,000 shares of stock of the Central Company should be exercised by the Georgia Company, its successor, successors, or assigns, by proper proxy to be given by the Central Trust Company of New York, the trustee in the mortgage. The whole number of shares of capital stock of the Georgia company was limited by its charter to 160,000. It appears that only the 120,000 shares above mentioned were ever issued. These 120,000 shares were all acquired and held by the Richmond & West Point Terminal Railway & Warehouse Company (hereinafter called the Terminal Company). On the 1st day of March, 1889, the Terminal Company, by a deed of trust to the Central Trust Company of New York, trustee (covering other matters and property), hypothecated, as security for the owners of certain of its bonds, 119,900 shares of the 120,000 shares of the capital stock of the Georgia Company, and 2,200 shares of the capital stock of the Central Company, providing that the voting power belonging to these hypothecated shares should be exercised

by the Terminal Company, its successor, successors, or assigns, by proper proxy to be given by the trustee. The Terminal Company owns and holds a majority of the capital stock of the Richmond & Danville Company (hereinafter referred to as the Danville Company), and through the Danville Company, or otherwise, controls all the different transportation lines known as the Piedmont Air Line. The aggregate amount of the par value of the stocks and bonds of the lines embraced in the Piedmont Air-Line system, owned by the Terminal Company, is alleged to be more than $34,000,000. It is alleged that the Terminal Company controlled, by stock ownership or otherwise, the lines comprising the East Tennessee, Virginia & Georgia system of railroads, aggregating 2,600 miles. It is alleged that these systems are competing carriers throughout the extent of the territory touched by the traffic of the Central Company. On January 1, 1889, the Danville Company acquired by lease, to run for 20 years from that date, all the railroad lines and other rights then held or to be acquired by the Georgia Pacific Company. On the 1st day of June, 1891, the Central Company made a lease of all of its lines to the Georgia Pacific Company, and thereupon the Danville Company entered into possession and control of all the properties of the Central Company. The interest on all bonds for which the Central Company was liable was duly paid. The semiannual dividend of 3½ per cent. on the capital stock of the Central Company and on the stock of the Southwestern, for the payment of which the Central was bound, was duly met; the last payment being made in December, 1891. On March 3, 1892, Rowena M. Clarke, one of the appellants (a minority stockholder of the Central Company), exhibited her bill to one of the judges of the circuit court, in chambers, alleging that the lease of the Central Company to the Georgia Pacific was unauthorized and unlawful; that the use of the properties of the Central Company by the Danville Company was destructive; that the control of the majority of the capital stock of the Central Company by the Terminal Company was in violation of the constitution of Georgia, and against the public policy of that state; that the officers and directors of the Central Company were the creatures of the Terminal Company, and that it would be idle for her to apply to them to obtain for the stockholders the relief of which the stockholders were in urgent need,—and praying that the court, by a receiver, would take possession of all the properties and business of the Central Company, declare the lease to the Georgia Pacific void, require an accounting from the other defendant companies with the Central Company, and enjoin the exercise of the voting power of the capital stock of the Central Company held in violation of the constitution and public policy of Georgia. The Georgia Pacific Company, the Danville Company, the Terminal Company, the Central Company, E. P. Alexander, president of the Central Company, and 11 other directors of the Central Company, were made defendants. On March 4, 1892, the circuit court, at chambers, passed an order that the defendants show cause, on a day named, why the injunction prayed for should not be granted pendente lite, and why the prayer for a permanent

receiver should not be granted; in the meantime appointed E. P. Alexander, the president of the Central Company, temporary receiver of all the property and assets of that company, providing that the ordinary business of the company and its connections be continued and conducted as usual till further order, without change of books or of accounts.    On March 24, 1892, the Georgia Pacific and the Danville Companies filed their respective answers to this rule to show cause, disclaiming all rights under the lease which the bill prayed to have annulled.    The motion for the appointment of a permanent receiver and for an injunction pendente lite, coming on to be heard, a decree was passed on the 28th March, 1892, appointing the president and directors of the Central Company a board of receivers, with usual powers, with this addition:

"It is further ordered that said directors, herein appointed receivers as aforesaid, shall have and exercise in the operation of said railroad, and in the conduct of ordinary business of said company, all the powers belonging to the directors of said company under its charter, and in accordance with the said charter and by-laws of said company, not inconsistent with this order nor the possession of said property by this court, and that, as directors of said company, they shall have the power to elect a president, and to fill any vacancy or vacancies in their number in the same manner as is provided for the filling of vacancies which may occur by resignation or otherwise in the board under the charter, but shall not pledge or dispose of any of the securities of said company, to raise money, without the approval of this court, except in the regular course of business."

It was also provided in the decree—

"That said Central Railroad & Banking Company of Georgia, and its directors, are enjoined and prohibited, pendente lite, from allowing the said Central Trust Company of New York, or the said Richmond & West Point Terminal Railway & Warehouse Company, or any other railroad company competing with the Central Railroad of Georgia that may, pending this order, acquire ownership of said stock, from voting said 42,200 shares of the stock of said Central Railroad & Banking Company of Georgia, or any part thereof, at any election or meeting at which the holders of the stock of the said Central Railroad & Banking Company of Georgia are entitled to vote under their charter. It is further ordered that an election for directors of the Central Railroad & Banking Company of Georgia shall be held at the principal office of the company, in the city of Savannah, on the 16th day of May, 1892, at such hours as may be fixed by the charter and by-laws of the company for such election, and that at such election no votes shall be received on behalf of the 42,200 shares of stock standing in the name of the Central Trust Company of New York, and alleged in the bill to be controlled by the Richmond & West Point Terminal Railway & Warehouse Company, unless upon a bona fide transfer of the same, approved by the court, and that the directors elected by the stockholders at such election shall, upon their qualification, constitute the board of directors of the Central Railroad & Banking Company of Georgia until the next election."

On May 9, 1892, the Georgia Company and the Terminal Company each separately presented to the court its surrender and transfer to the Central Trust Company of New York, in whose name this stock was registered, the right to vote the same at the election ordered for the 16th of May; and the Central Trust Company, showing the nature and purpose of its holding, and the interest of those secured, asked to be allowed to vote the stock at that election. The prayer of this application was denied by an order passed May 14, 1892. The election for directors was held May 16, 1892.

The Central Trust Company of New York, by its proper proxy, applied to the inspectors of the election to be allowed to deposit and have counted the votes of this stock. In obedience to the order of the court this application was, of necessity, refused by the inspectors, and that stock was excluded from participating in the election. The Central Company was thus relieved from the domination of the Terminal Company. Thereupon the Central Company brought its independent suit for an accounting against the companies against whom an accounting was prayed in the bill in this case, and it also filed its cross bill in this suit August 1, 1892, praying—

"That an accounting may be ordered between said Richmond & Danville Railroad Company, said Richmond & West Point Terminal Railway & Warehouse Company, and said Georgia Pacific Railway Company and your orator, and that your orator may have a decree against said companies, jointly and severally, for the said sum of $2,500,000, and for such other and further sums as may, upon an accounting, be found to be due to said Central Railroad & Banking Company of Georgia."

The appellants say in their printed brief:

"From this time on 'the complainants' bill had nothing to accomplish, except the adjustment of costs, and to make the injunction against the voting of the Terminal Company's stock permanent."

The record before us shows that the suit continued to be fruitful in novel proceedings and results, but we will not divert our attention from the single remaining purpose of complainants' bill, so well expressed in their brief. The bill coming on for final hearing and decree, the circuit court, on June 30, 1893, passed its decree as follows:

"Come now the parties, by their respective solicitors, and this cause came on for final hearing upon the pleadings, testimony, and exhibits, and was argued by counsel. Upon consideration whereof, it is finally ordered, adjudged, and decreed that except as to the averments of the bill concerning the invalidity of the lease dated June 1, 1891, from the Central Railroad & Banking Company of Georgia to the Georgia Pacific Railway Company, all rights under which were disclaimed by the answers of the Georgia Pacific Railway Company and the Richmond & Danville Railroad Company, filed herein March 24, 1892, the said bill of complaint be, and the same is hereby, dismissed for want of equity; and the injunction herein granted on March 28, 1892, restraining and prohibiting the exercise of any voting power on the forty-two thousand two hundred shares of stock in the Central Railroad & Banking Company of Georgia, set out in the bill, is hereby rescinded and vacated. It is further ordered that the complainant Rowena M. Clarke, and the interveners, Francis S. Hesseltine, Rebecca M. Hesseltine, Charles H. Woodruff, and A. O. Bacon, who have become co-complainants herein, be, and they are hereby, taxed with one-half of all the costs of this action accrued and made after March 28, 1892. The clerk is ordered to make such taxation, and file the same in court, and the said Clarke and her co-complainants are ordered, within ten days thereafter, to pay into court one-half the amounts of costs so taxed by the clerk; and the other half of such taxed costs is charged against the defendants, except the said Central Trust Company of New York and the Central Railroad & Banking Company of Georgia, and day is given. The question of the validity of the lease by the Central Railroad & Banking Company of Georgia to the Georgia Pacific Railway Company, as between said parties to the same and the Richmond & Danville Railroad Company and the Richmond & West Point Terminal Railway & Warehouse Company, is not passed upon in this decree."

It is clear from an inspection of this decree that the judge of the circuit court who presided when it was passed considered that there was then nothing at issue between the parties to this appeal, except the right to vote the 42,200 shares of stock. There was no longer any issue as to the validity of the lease. That issue presented by the bill, having been terminated by the disclaimers of the adversary parties made 24th March, 1892, was not passed on in the decree. As to it, the office of the bill had terminated. Hence, as to it, the bill was not dismissed, having done its work; and, no one resisting, its having or wanting equity had become, and continues to be, immaterial. The only question raised by the assignment of errors on this appeal, for us to consider, is, should the 42,200 shares of stock in question have been disfranchised while held by the parties then holding it, or by such parties similarly related to the Central Company as a carrier? The appellants contend that this question must be answered in the affirmative. They rest their contention on this provision of the constitution of Georgia:

"The general assembly of this state shall have no power to authorize any corporation to buy shares or stock in any corporation in this state or elsewhere, or make any contract or agreement whatever, with any such corporation, which may have the effect, or be intended to have the effect, to defeat or lessen competition in their respective businesses, or to encourage monopoly; and all such contracts and agreements shall be illegal and void."

The judge of the circuit court, in announcing his judgment, remarked. "The authorities have been read almost to confusion." We do not need to view the case at bar through a cloud of precedents, the application of which is so doubtful or remote that they will tend rather to obscure our vision than to aid our inquiry. Nor is it necessary to indulge in speculation as to the ultimate power of Georgia over the subject, or as to the undefined powers of a court of chancery to affirmatively deal with questions of state policy. As we have seen, the Central Company had its origin in the legislation of Georgia more than 60 years ago. It does not distinctly appear at what precise date the 75,000 shares which constituted its entire capital stock were originally issued and sold in accordance with its charter, but it is evident that this was done long before the adoption of the provision of the constitution invoked by the appellants. The present holders of the stock in issue are not Georgia corporations. Unless they are forbidden by the provision of the Georgia constitution just quoted, their right to acquire and hold the stock depends on the terms of the charters of the respective companies. If we may distinguish between its dividend-bearing quality and its voting power, the only limitation, if any, set to its voting power, is that it shall not be used to encourage monopoly, or lessen competition between carriers. The Central Trust Company of New York, in whose name the stock is registered, is not a carrier company in Georgia or elsewhere. The Georgia Company, which in 1887 acquired 40,000 shares of this stock, and retained its voting power till the filing of the bill and appointment of a receiver in this case, is not a carrier company. The Danville Company, which, it is insisted, controls the voting power of all the

stock in question, is a carrier corporation; but, so far as it is in competition with the Central Company, it is as to interstate traffic, and not to any material extent in matters domestic to the state of Georgia. It is settled that the powers of corporations are derived from the sovereign that creates them. When they enter another jurisdiction, and make contracts, their contracts are governed by the laws of the state in which the contracts are made. It is not shown here that any contract affecting this stock was made by these parties in Georgia, or with any Georgia corporation. It is contended that this stock should not be allowed to vote, because it is held, or its voting power is held, by another corporation, which, through this stock, and its other holdings of corporation stocks, does, or may and purposes to, so control the Central Company's system and its competing systems as to "lessen competition in their respective businesses, or to encourage monopoly." The logical, ultimate, practical result of this contention is that any stockholder in two Georgia corporations, or in one Georgia corporation and in a corporation of another state which may compete for interstate traffic to be carried out of or into the state of Georgia, cannot vote his stock in both corporations, and, if only one is a Georgia corporation, he cannot vote his stock in that corporation. We say "any stockholder," because the logic of the contention applies as well to holders who are natural persons as to corporations not created by the general assembly of Georgia. Referring to this contention, summarized somewhat differently, the judge in the circuit court is reported to have said, "It is an anomaly beyond expression, to my mind." To those only very partially cognizant of the state of stock holdings in this country, the contention seems to be revolutionary. We need not question the power of Georgia to so provide, but we must inquire, has she so provided? Has the language of her constitution such self-acting affirmative force as to require a court of chancery to enjoin the exercise of the voting power of this stock by its present holders at the suit of these appellants, on the case they have made? We conclude that it has not such force.

"No appeal lies from a mere decree for costs." In re City Nat. Bank (April 30, 1894) 14 Sup. Ct. 804, citing Bank v. Hunter, 152 U. S. 512, 14 Sup. Ct. 675. If the matter of costs, submitted on this appeal, is not such a mere decree for costs as will not support an appeal, it is such a matter as lies so largely in the discretion of the chancellor that the court of appeals would not review it, except in a case of grave and manifest abuse. The judgment of the circuit court is affirmed.